afternoon is 2024 50724 Ronald Smith v. Bexar County, Romero-Sanchez defendants. And we are very pleased again to have Judge Greg Guidry sitting with us by designation today. We'll first hear from the appellant. You may proceed with your statement. I'd like to thank the court and counsel Herrera for granting the continuance a month ago. My mother was ill and she's better now and now I can proceed to the legal issues. We're very glad your mother is doing better. I appreciate the magnanimity of the court. Now there are really only two issues here as to the seizure of Ronald Smith. On summary judgment the district court said Deputy Sanchez had probable cause to arrest him for speeding. That's legally and factually impossible and implausible under Texas statutory law. And I'll get to that. There also on 12 v 6 it was bandied about. Deputy Sanchez had a basis to seize Smith under an emergency mental health detention. I'm going to demonstrate that's also legally and factually implausible and impossible. Can we go back one step earlier? You don't contest that the officer affected an appropriate stop. Is that correct? Actually we do. We have a Terry stop claim in our legal claims for relief. We actually do. And let me explain that. In the video which is hearsay which we objected to, but the video depicts Deputy Sanchez monitoring traffic going the opposite direction. He's monitoring a cluster of cars traveling in the opposite direction. At the 30-second mark he turns around. So from the 30-second mark to the 45-second mark he's pursuing I think he said a gray compact car in his sheriff's report. You do not see my client's car in that in those images. That would be his point of view, the view of the camera. He did not have, my client is not in that footage. Also in his sheriff's report at 389 he says that Smith, he says that a citizen pointed him in the right direction. Why would he have to be pointed in the right direction if he had a direct line of sight? So we do contest that. Under Texas criminal law, Clark v. State in 2002, the 14th Appellate Court said the peace officer, even if they had a reasonable suspicion to detain a motorist, they lose that when they lose direct contact with the motorist. So we contest the legality of the initial stop. Also in the video at minute 2046, Deputy Sanchez is talking to Smith. Sanchez volunteers I might need to recalibrate my radar. Let me ask you for a second. You mentioned the gray car and your client referenced a gray car. He said a gray car was chasing him after he was stopped. Is that this, do you contend that's the same gray car? No, I do not. It appears to me my client's car is darker, is black, closer to black, but that's what the car that Deputy Sanchez described was gray. But your client also said that a gray car was following him. That's one of the things he did say. Was he referring to that same car or do you know? That I have no idea what he was referring to. How he got to that point. I know that he had lunch with his wife across Bexar County and he was returning back to his home. But as far as the specifics of his journey, I'm not privy to those. So we do contest the legality of the stop. We contest everything else. They waffled between the caretaking function and a lawful basis to arrest him for speeding. Well number one, at minute 110 Smith denies speeding. Number two, in his affidavit at 432, Smith claims he is observing the traffic laws. Number three, Deputy Sanchez never tried to write him a ticket for the initial basis of the stop. Under De Villavich's Mark and Till from this Fifth Circuit in 2009, this court held that when a motorist disputes the legality or the accusation of speeding, that creates a factual issue. But isn't that an issue that's resolvable by contesting the ticket? The officers give tickets every day in every jurisdiction where people say, well I don't think I deserve the ticket. I intend to go on the assigned date and plead my case. And isn't that normally how that's handled? Well your honor, I would agree with that. Except that Deputy Sanchez never pursued traffic infractions. Within a minute he's talking about guns, drugs, contraband. He's running Smith's plate for stolen vehicles. He's running Smith for fugitive wants and wants. But isn't that part of the video, there's something intervening between the initial stop and those type of questions. I mean your client, and I watched the videotape, you know your client, putting aside whether it's appropriate to consider the tape which you raise on appeal, I mean your client gives answers that tend to show, I hope you'll agree with me, that tend to show that he's got some issues mentally at the point, I mean the answers that he's giving at times seem nonsensical and suspicious, that maybe he's having some type of problem, if not, obviously not alcohol, but he's having some type of problem where he's not giving coherent answers. And then the officer starts asking him, I didn't mean to interrupt you, but the officer starts asking him, do you have any firearms in the car? So there's a higher level of questioning once those answers become apparent that he's not responding in a way that directly to the routine questions. I'm sorry, go ahead. Well perhaps the court's presuming there was a lawful basis, which I just elaborated, we do not believe there was. But let's say for the sake of argument there was. Under United States versus Sharp, which is 1985 Supreme Court case, and Rodriguez versus United States, which is a Supreme Court case in 2015, the Supreme Court says, even if you had a voluntary stop, you can't stray too far from the course. It's got to be reasonably related to the nature of the stop. Speeding has nothing to do with guns, drugs, and contraband, and he never pursued a traffic infraction, even if there were. That's very common, that you would ask someone that you pull over if you're suspicious, do you have guns or contraband while you're at a stop? That's a typical question at a traffic stop for the protection of the officers. Well the problem is, it's got nothing to do with the nature of the stop. I don't understand why that's so surprising here. It's got nothing to do with the nature of the stop. Well no, but often police officers stop people for speeding or having an expired ticket on their registration or whatever, and then they ask questions when they're there at the stop about, do you have any contraband or something. No police officer has ever asked me those things. They ask for my license, my registration, and we proceed. But we have lots and lots of cases where those are common kinds of questions. Some of them have to deal with the safety of the stop, and some of them are kind of fishing expeditions because they've got the person there. But nonetheless, those are very common questions, and his answers were strange. Do you agree with that? Well, they physically handcuffed him at 328. At 438, Sanchez takes his keys. At 440, he's tucked in the back of a cruiser where he never leaves. That is an arrest by my reckoning and by this court's reckoning. Gorski versus Guajardo, being tucked in the back of a cruiser for a couple of hours and handcuffed is equated to a formal arrest. So they arrested him. You can't arrest someone and then come back and, does he have guns? Does he have drugs? You can't do that. That's Henry versus United States. That's Beck versus Ohio. But didn't they put him in there because they were worried about him at that point? They're not worried about him. They're looking in his car for guns, drugs, and contraband. At minute 943, there are three deputies searching his car, and this is after the car comes back to him. It's not stolen. They continue to hold him after the dispatcher comes back at 1408. There's no fugitive wants or warrants. Under Rodriguez versus United States, they would have to let him go. He could not be arrested for speeding under the Texas Transportation Code 543.004. But could they let him go if he's behaving strangely, or do they have a duty at that point to do something different? Deputy Sanchez called Smith's wife, and she's in route, and at minute 4305, she actually arrives. And at minute 4512 or so, he says, now Smith is going to the hospital. He was under an arrest. There's no way to categorize it any other way. He's cuffed and stuffed. They're searching his car. No criminality comes back from their little checks. Under Supreme Court case precedent, they had to let him go. He couldn't arrest him for the offense of speeding. Under our Texas then and only then can he cuff and stuff him. That's our statutory law. If you're putting the person under arrest, if you're putting the person under custody, that's what you said is true. But if it's because he's being kept because they're concerned about his welfare, then that's not true. Is it? And so why, tell me, where under the law could they not be concerned? I'll be candid with the court. I don't believe anything police say. I do criminal law. You do criminal law. You overhear many criminal cases. At 1338, in the video, Deputy Sanchez himself is talking to another responder. This other deputy is saying, is it a mental issue? Deputy Sanchez says, no, it's not excited delirium. At 2448, Deputy Sanchez says, literally, it's not a mental issue. Smith is tucked away in the back of a cruiser. His wife is in route. He's handcuffed. He can't move. He can't do anything. How is he a danger to himself or to others? Under the federal standard for an emergency detention, a peace officer has to have probable cause to believe a person has a mental illness and they're a danger to themselves or to others. We're talking suicidal or homicidal. That's what this Fifth Circuit said in Rich versus Palco from 2019 in Cantrell versus City of Murphy. That's the federal norm. That's a federal standard. How is he suicidal? How is he homicidal? Why don't you address your client's behavior? You've been asked about it twice. You're not addressing it. The video shows him basically jumping out of the car and coming very quickly toward the police officer. He then couldn't remember his birth date. He couldn't remember basic information. He said he was illiterate, yet he has an advanced driver's license for commercial vehicles. Why don't you address his behavior? The police officer is reacting to what is happening at the time. He initially was responding to someone he thought was speeding, but then other events began to take place and he's reacting to those. You're not responding. He's had dyslexia since age six. He can't recite a driver's license number like we can. He can't recite a social security number. He can't recite a birth date. It's a learning disability. It's not a mental disability. Facts, figures, text, and numbers, he can't recall those. He also, this is less than a year after the George Floyd tragedy, so he was leery of police. A lot of people actually fear the police because of recent events and current events. He was one of those. He doesn't know what they're going to do. He doesn't know why he stopped. He's physically blocked by Deputy Sanchez's motorcycle. So it doesn't satisfy a legal basis to arrest him for speeding, as I've elaborated. It doesn't satisfy to have an emergency mental health detention. It doesn't satisfy the federal standard. It doesn't satisfy the Texas standard. Mr. Herrera cited that on summary judgment. The Texas Health and Safety Code 573.001. It's even harder than the federal standard. A peace officer has to have probable cause to believe a person has a mental illness and they are a danger to themselves or to others, suicidal, homicidal, and there's no time to get a warrant. This event lasted two hours and 27 minutes. That's at 382.00 in the record. Two hours and 27 minutes. That's plenty of time to get a warrant. They didn't get one. They're sitting around in the parking lot. What they're waiting for is a hospital that's going to receive Smith. That's at 383.00 in the record. It's got all that laundry list of hospitals that wouldn't accept him. They had to drive him across Bexar County to accept him. And let's talk about his medical records. At 441.00 to 446.00, those hospital records show he has no mental crisis. He's lucid. He's calm. They discharged him on his own accord. He didn't need anyone to pick him up. And it even talks about our claim that was dismissed on 12B6.00. We claimed excessive force from the handcuffing. The hospital records notate that at 445.00. He's got pigmentation, discoloration on his wrists. And then Smith actually talks about that in his affidavit, how that hurt him and affected him in his driving. So the doctors found no mental crisis. At minute 31.00 or so, Smith is talking to the other deputies. He's engaging them. He doesn't like Deputy Sanchez. He's conversing with the other deputies. Was there any history between Deputy Sanchez and your client? No. He didn't like his I'm the law attitude. You know, get over here. You're going to be handcuffed. You're going to be placed in the back of the car. I'm going to search your car. Can you tell me what your legal position is with regard to the video? The video is hearsay. It's unauthenticated. We objected to it. We object to all other evidence. There's no custodian of records. There's no witness. We can do that under Fifth Circuit precedent. Okay. You know that under the summary judgment standard, you don't actually have to have evidence in admissible form. It just has to be capable of being put in admissible form. Well, the Fifth Circuit still has a mechanism where litigants can challenge unauthenticated evidence. Lee v. Offshore Logistical from 2017. Are you saying this is a fake dash cam or body? I'm saying, why can't they have an affidavit from a custodian of records? Why can't they have someone attest that it's authentic and true? It only takes a page or two. And yes, I have reason to doubt it, because in my summary judgment affidavit, it's 464 to 477 in the record. I tried to get these videos before filing suit. You know what they told me? They told me the video of the traffic stop and his seizure, they don't exist. They didn't give them to me. Mr. Herrera at the Rule 16 Conference blurted out that they did exist. They told me they did not exist, and they didn't give them to me. They gave me two videos of Smith sitting in the back of the cruiser. He's as calm as can be. And it indicated on those videos that they were part of a larger video, that they were clipped from a larger video. They didn't give me the whole video. That's why I come up with this crop that edited business. That's what it said on the video. Is it your position that to the extent that the officer thought that your client was experiencing some kind of schizophrenia, that he would not have had a right to do a mental health? It doesn't satisfy the federal standard. He's not homicidal. He's not suicidal. He's actually joking with Deputy Sanchez in the first couple of minutes. He's actually cracking jokes at Sanchez's expense. There's nothing you can construe out of that where he's suicidal or homicidal, and that's the federal standard. So you're saying any kind of issues that are not directly suicidal or homicidal, they're not allowed to do any kind of health check? That's what the federal standard is in all circuits. I go by the federal standard. I don't go by what an untrained deputy thinks or believes. He's not a professional. As it turns out, the hospital didn't agree with him either. Okay, I think your time has expired, sir, and you've saved time for rebuttal. May it please the court. Jose Herrera here on behalf of the Appalese-Bear County and Deputy Ramiro Sanchez. While this case does involve a Fourth Amendment and Section 1983 issue, what this case is really about is upholding Supreme Court and Fifth Circuit precedent regarding pleading standards and a 12B6 motion and video evidence when determining a motion for judgment, which is what took place in this case. Now, of course, I'm going to ask that the court not disturb the district court's decisions on the motion to dismiss and the summary judgment. Is it true that y'all denied having videos and that didn't come up until the Rule 16, even though they were asked for before the suit? So the interesting part about that, Judge Elrod, is that, and the rest of the panel as well, is that that request took place prior to my involvement in litigation and that was sent directly to the Bear County Sheriff's Office. If you look very closely at opposing counsel's request, it specifically asked for two videos for Deputy Sanchez and Deputy Espino, who were both on the scene. Bear County provided two of those videos because that was all that was requested. Now, I was not privy to what videos were exchanged. However, when it came down to the suit being filed in district court and then landing in my hands, as part of initial disclosures, it was my duty to determine what all existed at that stage and then subsequently . . . You didn't disclose the initial disclosure? I did, Your Honor. I did determine . . . So there was a position that it wasn't requested before? Okay. I turned them over under my duty to under initial disclosure, yes, and that was as early as September of 2023. I have a question. Where Officer Sanchez informs someone, maybe it's his supervisor or someone, that Smith is foaming at the mouth and vomiting, that doesn't seem to actually be occurring, and so that caused some consternation when I looked at the . . . That might be testimony from one of the other officers on the scene. As I understand it in my recollection of the videos, it might have been taking place while he was in the back of the cruiser shouting to the officers, I hope you all get COVID, I'm not going to lick your boots, and . . . I don't see any foaming at the mouth or vomiting in this case, and that was very odd. Do you see any foaming at the mouth or vomiting on any of the videos? I did not, but it is difficult to determine that from all the vantage points from six or seven of the officers on scene. What would be the basis? Why would it say that? That part I'm not sure, Your Honor. However, in any event, as the District Court pointed out, the events from the inception of this were highly unusual, as has already been pointed out, and the beginning of the video shows a black Toyota Camry, it looks like, or at least a sedan traveling at a high rate of speed in the opposite direction of traffic. Officer Sanchez immediately pulls a U-turn and sees exactly where this car pulled into, that subdivision where he was unable to basically go anywhere, because it's one of those gated ones that has the U-turn for people that basically aren't supposed to be there. Are you relying on the community caretaking exception in this case, or do you think that you prevail without regard to that? I am relying on the community caretaking. As stops go, they are fluid in nature. As Judge Arwad pointed out earlier, sometimes there's an expired sticker, a busted taillight, et cetera, and it evolves into more. That is not unusual whatsoever in any traffic stop in any jurisdiction. But within the first minute, Mr. Smith jumps out of his car, begins shouting at Deputy Sanchez, and keep in mind, Deputy Sanchez does not know him, so he is not used to his level of humor when he's asked, do you have any weapons? He has to speak to an attorney. And at that point, Deputy Sanchez clearly states on the video, for my safety as well as yours, and those are quotes, you are not under arrest, but I need to, because of his evasive answer, needed to determine what all was going on with Mr. Smith after having already previously failed to identify himself, having that CDL, never mentioning that he has dyslexia or difficulty recalling information. And so those are all part and parcel to furthering the community caretaking function in addition to the fact that Deputy Sanchez did not request a blood draw despite Mr. Smith's highly erratic behavior, was not, didn't even open the trunk. So if he truly was searching for this criminality, Deputy Sanchez was really not showing much of an effort to do so. But let's talk, the initial stop though, the video doesn't show speeding. So why isn't there a fact issue on whether or not he's speeding? You can't tell that they're speeding, and so why isn't there a fact issue on the initial, the legality of the initial stop? I think Deputy Sanchez's statements at the inception of the stop is sufficient, where he specifically states 61 in a 40. That's what he says. Correct. And the other person says no, and so why isn't there a fact issue on whether that was the reason for the stop? If you can't tell it definitively on the video, and it looks like he's just in the flow of traffic, then why do we presume that the stop is a valid stop, which is important? Correct, Your Honor. But it's a test of reasonableness also, and I believe under the Fourth Amendment there, even if he has a mistaken, Deputy Sanchez has a mistaken belief that there was speeding, the rest of the stop turns into the community caretaking because of Mr. Smith's actions at the, you know, at that. Yeah, but you, what's the initial, what's the best case you have or something that says it doesn't matter whether he was actually speeding or not? Well, Deputy Sanchez has the, we offered the video camera, and he offered an affidavit as well, stating that he was going 61 in a 40, and so because of that, we believe that that's sufficient because Deputy Sanchez could testify at trial if it comes down to that. And then the other side says, no, I wasn't speeding. Correct, but also. I mean, the problem is it's not summary judgmentable, is it? I believe it still is. Why? Well, Mr. Conn, opposing counsel failed to request discovery also in this matter to see what Deputy Sanchez might have relied on, and I believe that this was ripe, as the court stated, for summary judgment because of how the events transpired. I think it was enough for Deputy Sanchez to state that. Even if the belief is mistaken, it must have come from somewhere. And so in furtherance of that, I believe under the Fourth Amendment, there would not be any violation. Do you dispute that the opposing party contests, that Smith contests that there was speeding? Is there summary judgment evidence on both sides of this issue in the record? They do contest it. However, I believe that the video is clear, and the District Court also found that the video was clear to refute that there was any speeding. You can say from the video that there's speeding? I did, and the District Court did as well. And you know we get to look at it fresh? Correct. It is de novo, yes, I understand that. If it's not clear, assuming argument it was not clear, then where do we go with this on summary judgment? If there's evidence both ways, speeding, not speeding, what do we do? I understand the question, Your Honor. I do believe that there would be, I have no choice but to concede that there's a fact issue in that regard. However, I don't believe so under the, because of the video, because of the District Court's ruling, and because of Sanchez's own statements, that there was sufficient probable cause to pull over Mr. Smith in the first place, in addition to the fact that when Mr. Smith was asked, why were you speeding? He admits that he was being chased by a car. He says that first, and then he says he's not speeding. Yes, so he does both. It is both, and that's where the waffling is, not with the community caretaking function, because the rest of the video shows that the community caretaking function is necessary, and Deputy Sanchez is not looking for the criminality that we so often find. There's no planting of drugs or anything else. There is no subterfuge, if you will, that he is looking to charge Mr. Smith with any sort of crime. In fact, even with Mr. Smith's own admission, he didn't even get a speeding ticket, and again, the speeding ticket was not there. There was no request for blood draw. The evaluation and the waffling with the officers took place in order to appropriately determine and further the community caretaking function. In other words, they're debating on what it is, and while they have some training and certifications regarding mental health issues, they're not licensed medical providers, and that's where the ambulance and subsequent visit to the hospital came in. Why did they continue to search in the car after he's? They were looking for his identifying information. They found it in his glove box, right? They did. After that, why did they continue to search in the car if he's not there, so it's not a threat to them at that point? Well, they found his license, but his license wouldn't necessarily have that information to contact somebody else, right? Our licenses don't have next of kin or any other identifying information on who to contact to help this man out, and eventually they did find that information regarding Mr. Smith's wife, who showed up on the scene, I believe 40 minutes or so later, and in the meantime is when he's in the back of the cruiser, and he's not being questioned in the back of the cruiser either. He's not being questioned as to whether his car is stolen. He's not questioned yet again or under interrogation to the point where he needs to be Mirandized regarding drugs or weapons or any other sort of criminality. He's not being treated like this criminal, so to speak. It is unusual in a community caretaking situation if they're not a danger to people that they're sent to the hospital rather than just have their loved one take them to deal with them. I also believe that... Can you explain? Was this the right approach under their procedures, or should they have let him go with the wife? It doesn't mean you lose the case. No, I understand. It's the right procedure. I understand, Your Honor, and I believe it was. Why? Because we also don't know if the wife is medically trained, and while she represented that he does get anxiety specifically around police, at that point, the police officers, the deputies for the sheriff's office, did have the duty to get him evaluated by licensed medical professionals at that point to also maybe... The duty to get him evaluated? Yes, to make sure that he was not a danger, not just to himself, although I understand that he's in cuffs, but if they let him go and his wife is somehow harmed also as a result of his agitated state, then that also presents liability for the officers, I believe, because that's something that they could have maybe prevented by, again, sending him to the hospital. And of course, by the point that the hospital evaluates Mr. Smith, they do show he's stable, et cetera, no injuries to his wrists, by the way, and therefore release him after determining on their own that he is not a danger anymore. And again... Another question. We watch videos pretty much every month when we sit now because there's so many videos and so many stops, but this is unusual in that the body cam is muted many, several times in this. That seems very unusual. Do you have any comments on that? I do, Your Honor, and so Deputy Sanchez had, I believe, two separate videos, and the portions that are... So I only provided the relevant body cam videos that would obviously assist my summary judgment motion, which were Deputy Sanchez's videos, and at one point, I believe what you might be referring to, he maybe places his helmet or something on the hood of a car. However, the portions of the video that are not picked up by Sanchez's own body cam are picked up by other officers, and he's talking to his supervisor, and it comes in and out also. The entire conversation isn't picked up by the body cam, but there's enough there to piece together that he is on the phone with his supervisor trying to determine what to do to further help Mr. Smith, not charge him with some crime. And again, no discovery was proffered by opposing counsel to say, hey, what was the nature of that conversation? Again, these are all in parcel to the district court's correct determination regarding rendering summary judgment. And if I may, the district court identifies how, and again, of course, under Tolan and his progeny, the plaintiff's version, or appellant in this case, version of events is to be taken as true. However, because of cases like Scott, Bagley v. Giegan, which came out of the Fifth Circuit, when there is video evidence that blatantly contradicts the plaintiff appellant's version of events, then that's what the... But what is that that you're talking about? I'm sorry? What video evidence in this case blatantly contradicts the appellant's view? Deputy Sanchez's. What specifically? What is the contradiction? Does the video prove something? All the facts that are alleged that Deputy Sanchez somehow doesn't like him. The fact that he twisted and cut his nerves and wrists with the handcuffs to be so tight as to cause visible, lasting trauma. Almost the entirety, if not the entirety, of the plaintiff's pleadings or alleged allegations are disproven by the video. At one point, Mr. Smith alleges that he was placed in a Hannibal Lecter-style mask. There's no video that ever shows that taking place. You know, so there's a whole host of these issues. And as the District Court points out, and as I will today, Deputy Sanchez's behavior during the entire encounter was professional, it was calm, it was collected, and in furtherance of the community caretaking function. He did not yell at Mr. Smith. He did not berate him. He did not deploy weapons or tasers or capsaicin pellets. None of that took place. They were treating Mr. Smith as somebody that had issues that were very visible on the videotape and acted accordingly. I think it's a textbook stop in order to show the community caretaking function as it's applied properly. They did not have time to get a warrant. And by the time that he was placed in cuff, of course, he would not be in danger. But when he's evasive regarding the question of do you have weapons and he says, I want to talk to an attorney, Deputy Sanchez, with the nature of the officers right now, I believe acted reasonably, which is the test, in saying, again, for my safety as well as yours, I'm going to place you in handcuffs. And there's portions of the video that show that the cuffs were loose enough that he could still jiggle around in his pockets, etc. So, you know, that's to keep him from harming himself. But also, it was not the type of excessive force that you typically see. I'm sure you all have seen cases where there's very clear or at least a question of excessive force. And in this case, it simply does not exist. My time is almost up. But I would want to, I guess, address the, you know, the fact that, again, the community caretaking function effectuated by Deputy Sanchez, I think, again, was textbook. Mr. Smith's behavior, as shown in the video, and as the district court finds, was highly erratic and unusual for a simple traffic stop. And regarding the pleading sufficiency also, I believe that the district court's opinion on that should be undisturbed. Because the fact of the matter is Mr. Smith failed to articulate any facts that would cross the line from conceivable to plausible, which under Twombly and Iqbal would be the prevailing standard. You know, honestly... Do you give your time back? I do. I'd give my time back. Thank you. We have your argument. Thank you. Do you have rebuttal, sir? I do, Your Honor. Do I get the free will? I don't know what free will... It'd be just... Okay. He brought up a point. He's saying I didn't proffer discovery. In Bexar County, once 12B6 motions are filed, there is no discovery. He filed his 12B6 motion, his renewed one, in mid-June of 2023. We didn't get a scheduling order until August of 2023, and then the district court fast-tracked the 12B6 into summary judgment. It's through no fault of mine. It's not permissible once 12B6 are filed. That's the way we do it in Bexar County, and I'm sure they would have objected. Let me talk about the 12B6. It was improperly converted to summary judgment. There are four factors that have to be met. He filed his renewed 12B6 motion on June 16, 2023. He did not attach any documents or videos or evidence to it. Four months later, he unilaterally decides, hey, I'm going to tuck these videos and these other police files, and does so. Well, I moved to strike that, but that's another issue. But under Fifth Circuit case law, Collins v. Morgan Stanley Dean Witter from 2000, there are four criteria that have to be met. He's trying to say incorporation by reference. That's when defendants attach documents to their 12B6. The first factor is the information has to be vital to the plaintiff's claims. It was not. We didn't get the videos. I was told they didn't exist. How could they be vital to our claims? Number two, I have to repeatedly refer to this evidence or information. I refer to one paragraph out of 6,600 words. So that's not met. Number three, the authenticity of this evidence cannot be challenged. They can't meet that. I'm screaming at the top of a mountain. It's hearsay. And number four, he didn't physically attach it to his motion. On that factor alone, it cannot be converted to summary judgment. Let me talk about the caretaking function. You've got criminal investigations, and then you've got the caretaking. They're separate branches of different trees. They cannot co-mingle. They cannot co-abide. They cannot exist. They cannot intersect. And I'll explain why. Otherwise, law enforcement is going to take advantage of that to ingratiate themselves and then search for criminality. Let me give you an example. A cop sees me changing a tire off the side of the highway. Hi, how you doing? You need a tow. Can I give you a ride? Hey, can I look at your trunk? That's what police will do. I think we all are cognizant of that. The case law is clear. They cannot intersect. You can't spawn a mental health crisis from a criminal stop, and that's what a traffic stop is under Texas law. Under the Texas Penal Code 12.23, minor fine-only traffic infractions are considered to be criminal in nature. A traffic stop under Berkmer v. McCarty, Supreme Court 1984, is a form of a Terry stop. It's criminal. Delaware v. Proust, Supreme Court 1979, a traffic stop is a detention. It's a seizure. So they cannot co-exist. But let me talk about that. In the Texas Court of Criminal Appeals, the highest court in criminal law in Texas, has an opinion, Corbin v. State, from 2002. They have four factors which they identify as to what would justify caretaking stop or encounter. Number one, the citizen has to be in distress, the degree of distress that they're in. Number two, their location. Number three, whether there's help available from any other person. And number four, what's going to happen if the cops don't help them? They can't satisfy any of those factors. If that's where they're going, Smith's wife was on her way. He's tucked in the back of a cruiser. He's handcuffed. No harm can come to him. He can't do anything. He's a couple of miles from his home. His wife was there to pick him up. He stopped off a busy thoroughfare. He is not isolated. He's not in distress. In Corbin v. State, a traffic cop saw a motorist and then it appeared to the cop that the motorist was sleepy or weary. So the police officer forced an encounter. And then soon it degenerates into searching the driver, searching their car, looking for drugs. The Texas Court of Criminal Appeals said it cannot satisfy that criteria. Your basis was pretextual. It was solely upon hearsay evidence. It's unauthenticated. That is a fact. That's not an opinion. But he only accepted the hearsay evidence for the factories which helped them. In my brief in Section 1H, I outlined all the things in their hearsay evidence which are party admissions, which shoot them in the foot, and which controvert their legal position. The district court pretended he didn't see those things. My point is that if you're going to accept hearsay, which is rubbish, you have to accept it as an entire instrument. Counsel, your time has expired. Thank you. We have your argument. We have both arguments and this case is submitted and this concludes this sitting of the court.